**CREYTS COMPLEX, INCORPORATED, a Michigan corporation, Plaintiff–Appellant,**

v.

**MARRIOTT CORPORATION, a Delaware corporation, Defendant–Appellee.**

No. 95–2840.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1996.

Decided Oct. 21, 1996.

---

Donald J. Harman, La Crosse, WI (argued), for Plaintiff–Appellant.

Robert J. Trizna (argued), Trizna & Lepri, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, RIPPLE and KANNE, Circuit Judges.

KANNE, Circuit Judge.

After the demise of negotiations concerning amendments to an agreement for the conveyance of real estate between Creyts Complex, Inc., and Marriott Corporation, Creyts Complex brought a diversity action against Marriott for breach of contract, and Marriott responded with a counterclaim for breach of the same contract. After a bench trial, the district court found that the agreement had expired by its own terms prior to the breakdown of negotiations and, thus, that neither party could succeed on their claim because there existed no enforceable contract at the time of the alleged breaches. Pursuant to a term of the agreement that expressly survived termination, the district court also awarded Marriott its costs and attorney fees relating to its defense of Creyts Complex's action. Creyts Complex appeals both the judgment against it on its claim for breach of contract and the district court's imposition of costs and attorney fees. Agreeing with the district court's decision on the merits but disagreeing with its interpretation of the contract's fee-shifting provision, we modify the award of costs and fees and, as modified, affirm the judgment below.

## I. History

In 1986, Marriott—a company principally engaged in the businesses of hotel management and food catering—became interested in purchasing certain real estate located in Oak Creek, Wisconsin, in order to erect a Courtyard Hotel. As it turned out, the property Marriott wished to purchase actually comprised a portion of a plot of land owned

by Creyts Complex and a portion of a contiguous real estate plot owned by Sarah Moss and Natalie and Jerome Glowacki, who have collectively been referred to in this litigation as the Moss–Glowacki group. Marriott essentially wanted to carve out and combine the choicest land from both parcels in order to form the site for the new hotel.

On December 30, 1987, after extensive negotiation, Marriott entered into a real estate purchase contract with Creyts Complex to acquire the entire parcel of desired property for $598,500. Because Creyts Complex owned only a portion of the land that it was to sell to Marriott under the contract, one of the contract's conditions to closing was that Creyts Complex would successfully acquire the Moss–Glowacki parcel and ensure that the land had telephone, electric power, natural gas, water, and sewage facilities sufficient to sustain Marriott's planned hotel construction. Accordingly, on November 30, 1987, Creyts Complex had entered into an agreement with the Moss–Glowacki group for the conveyance of the Moss–Glowacki parcel, with that agreement stipulating that the sale of the Moss–Glowacki parcel would close no later than March 1988. Other conditions to closing outlined in the Creyts–Marriott contract included that Marriott would secure all the necessary permits for the construction and operation of the hotel, and that Creyts Complex and Marriott would through mutual cooperation obtain zoning approval for the proposed construction and improvements.

According to the Creyts–Marriott contract, the deal was to close within 120 days of Marriott's acceptance of the contract's offer of sale, with Marriott being entitled to an automatic 60–day extension upon giving written notice to Creyts Complex. For the purpose of establishing a closing date, Marriott officially accepted the contract offer on January 5, 1988, triggering a closing date of May 6, 1988. Clauses in the contract provided that time was of the essence and that all amendments to the contract were to be in writing.

Unfortunately, all did not go smoothly. Although both parties expended significant sums in attempts to effectuate the transaction, difficulties in fulfilling the various conditions to closing required under the contract delayed consummation of the sale. The Creyts–Moss–Glowacki contract expired for failure to close in March of 1988, and it became apparent that the Creyts–Marriott contract would not close by May 6, 1988. Pursuant to the contract, Marriott sent Creyts Complex notification on April 22, 1988, invoking the automatic sixty-day extension, pushing the closing date back to July 5. The parties then negotiated and signed a written letter amendment to the contract dated June 17, 1988, extending the closing an additional ninety days to October 3, 1988.

From September, 1988, through the middle of the following year, the parties continued to negotiate how they might proceed with the sale. Back and forth between them, they sent drafts of proposed amendments that would, among other things, further extend the closing date, but none of these amendments was ever signed. The primary impediment seems to be that the City of Oak Creek stepped in and demanded that in order for the parties to obtain the required permits and zoning approval, the improvements to the land proposed under the contract—together with certain conditions and obligations related to the zoning of the property (both the property to be sold to Marriott and the residual portions of the Creyts Complex and Moss–Glowacki parcels)—would have to be made part of a comprehensive development agreement between Creyts Complex and Oak Creek. Marriott took the lead role in attempting to expedite the creation of such a development agreement. However, Creyts Complex's management had serious concerns about the obligations that the development agreement would impose upon Creyts Complex with respect to the large portion of the two land parcels that Marriott would not purchase under the contract and that Creyts Complex would be left owning. Thus, Creyts Complex declined Marriott's frequent urging for it to sign the development agreement and an amendment to the contract extending the closing date.

Apparently in order to get Marriott to bear the full responsibility of the proposed development agreement, Creyts Complex sent a letter dated September 1, 1989, offer-

ing to renegotiate the contract to sell Marriott the Moss–Glowacki and Creyts Complex parcels in their entirety. Marriott rejected this offer and, by letter dated September 12, 1989, demanded that Creyts Complex sign an amendment to the contract by September 20. On September 21, Creyts Complex informed Marriott that it was no longer interested in completing the real estate transaction and that it had decided to terminate any further negotiations.

Creyts Complex subsequently brought this diversity suit in the Eastern District of Wisconsin, alleging Marriott's breach of the December 1987 real estate purchase contract. Marriott filed a counterclaim alleging that Creyts Complex had breached the same contract. After a bench trial, the district court determined that because the agreement had expired for failure to close on October 3, 1988, and no written amendments further extending that date had been signed by the parties, no enforceable contract between the parties existed at the time the deal fell apart, and thus neither party could be found to have breached the contract. The district court also pointed to a clause in the Creyts–Marriott agreement that provided:

> In the event any dispute hereunder or hereon results in the bringing of any action by either party hereto against the other, the party in whose favor the final judgment is rendered shall be entitled to recover its costs and reasonable attorneys' fees. Notwithstanding anything contained herein to the contrary, the rights and obligations contained in this provision shall survive the closing and/or the termination of this Contract.

Based on this provision, which expressly survives the expiration of the contract, the district court awarded Marriott its costs and attorney fees incurred in the defense of Creyts Complex's suit for breach of contract.

## II. Analysis

### A. Breach of Contract

Creyts Complex admits that there were no written amendments extending the closing date for the Creyts–Marriott agreement beyond October 3, 1988, and that the contract expressly required any amendments to be in writing. It is also undisputed that the Wisconsin statute of frauds for real estate conveyances generally requires, among other things, that a contract for the sale of land be in writing in order to be enforceable. Wis. Stat. § 706.02. Creyts Complex's primary argument at trial and on appeal, however, is based on Wisconsin's codified detrimental reliance exception to the statute of frauds. Wis. Stat. § 706.04(3)(b). Under this provision, a party may be estopped from claiming that an oral agreement to convey land does not satisfy the statute of frauds so long as (1) the terms of the agreement may be satisfactorily proved, (2) the party seeking to enforce the contract in good faith relied on the agreement to his detriment, and (3) the relying party's detriment was incurred with the knowing consent or approval of the party sought to be estopped. *Id.* Creyts argues that it relied to its detriment on its continued negotiations with Marriott and, thus, that there was an enforceable agreement between the parties to extend the contract's duration despite the fact that no written amendment extending the closing date beyond October 3, 1988, had been signed.

Creyts Complex's argument must fail, however, because this statutory exception to the statute of frauds requires one to have detrimentally relied upon an *agreement* that is not in writing, and there was no evidence whatsoever presented at trial of an oral agreement between the parties extending the duration of the written contract. Creyts Complex argues that the parties' conduct created an agreement to extend the contract, but the parties' conduct was nothing more than continued negotiations concerning an amendment that would, among other things, extend the life of the contract. This is not a case where we are asked to look at two merchants' course of conduct in order to discern the understood terms of their long-standing relationship, *see, e.g., Waukesha Foundry, Inc. v. Industrial Engineering, Inc.*, 91 F.3d 1002 (7th Cir.1996); rather, this is simply a case where two parties were negotiating an amendment to a contract concerning the contract's duration, and the negotiations deteriorated and broke apart. To consider the conduct of negotiating over a

contract term to create an agreement as to that term would illogically result in the detrimental reliance exception's converting every negotiation into an enforceable contract so long as one party relied to their detriment on the possibility that the negotiation might be successful. We cannot accept such a strained interpretation of WIS. STAT. § 706.04(3)(b).

Finally, Creyts Complex points to the following statement by the district court at the hearing where the court announced its findings of fact and conclusions of law:

> I do not find, contrary to counsel's suggestion, that the exception found in section 706.04(3)(b) of the Wisconsin Statutes to be at all applicable in this instance, for I find from the factual evidence that was presented that the plaintiff's position with respect to this transaction, although certain monies were expended, they pale in comparison to the monies that Marriott Corporation spent with regard to its efforts to consummate this transaction.

Creyts Complex maintains that there is no basis in Wisconsin law for this comparative detriment approach to the detrimental reliance exception, and thus it argues that we must reverse the district court's decision. Reversal is not warranted on this issue, however, because absent an agreement between the parties the issue of detriment is irrelevant. Regardless of how much money Creyts Complex expended, without an enforceable written agreement—and without evidence of a definable oral agreement upon which it justifiably relied—Creyts Complex cannot maintain a breach of contract action.

### B. Fees and Costs

 Based on the surviving contract term that "[i]n the event any dispute hereunder or hereon results in the bringing of any action by either party hereto against the other, the party in whose favor the final judgment is rendered shall be entitled to recover its costs and reasonable attorneys' fees," the district court awarded Marriott its costs and attorney fees for defending against Creyts Complex's breach of contract action. The district court was definitely correct that Creyts Complex's cause of action arose out of a dispute

over the contract and that Marriott was the prevailing party as to that cause of action. However, the district court did not address the effect of Marriott's counterclaim on the costs and attorney fees calculus. Had Marriott not brought a counterclaim, the district court's award of fees would certainly be correct. But the contract's fees and costs provision does not limit itself only to the first action brought in a dispute; it applies "[i]n the event any dispute hereunder or hereon results in the bringing of any action by either party hereto against the other." Marriott's counterclaim also arose out of the parties' dispute over the contract, and as to Marriott's action Creyts Complex was the prevailing party. We therefore modify the district court's order so that it will not only award Marriott its costs and attorney fees incurred in defending against Creyts Complex's breach of contract action, but will also award Creyts Complex its costs and attorney fees incurred in defending against Marriott's breach of contract counterclaim.

The judgment of the district court, as modified, is hereby AFFIRMED.